Cocheyse J. GRIFFIN et al., Appellants and Cross-Appellees,

v.

BOARD OF SUPERVISORS OF PRINCE EDWARD COUNTY and J. W. Wilson, Jr., Treasurer of Prince Edward County, State Board of Education of the Commonwealth of Virginia and Woodrow W. Wilkerson, Superintendent of Public Instruction of the Commonwealth of Virginia and County School Board of Prince Edward County, Virginia, and T. J. McIlwaine, Division Superintendent of Schools of said County, Appellees and Cross-Appellants.

No. 8837.

United States Court of Appeals Fourth Circuit.

Argued Jan. 9, 1963.

Decided Aug. 12, 1963.

J. Spencer Bell, Circuit Judge, dissented.

Robert L. Carter, New York City (S. W. Tucker, Henry L. Marsh, III, Richmond, Va., Barbara A. Morris, New York City, Frank D. Reeves, Washington, D. C., Otto L. Tucker, Alexandria, Va., on brief), for appellants and cross-appellees.

Burke Marshall, Asst. Atty. Gen. (St. John Barrett, Harold H. Greene and Alan G. Marer, Attys., Dept. of Justice, on brief), for the United States, as amicus curiae.

Collins Denny, Jr., Richmond, Va. (John F. Kay, Jr., Richmond, Va., C. F. Hicks, Gloucester, Va., Denny, Valentine & Davenport, Richmond, Va., and DeHardit, Martin & Hicks, Gloucester, Va., on brief), for appellees and cross-appellants County School Board of Prince Edward County and T. J. McIlwaine, Division Superintendent of Schools of said County.

J. Segar Gravatt, Blackstone, Va., Sp. Counsel for Board of Supervisors of Prince Edward County (Frank Nat Watkins, Commonwealth's Atty. of Prince Edward County, on brief), for appellee and cross-appellant Board of Supervisors of Prince Edward County.

R. D. McIlwaine, III, Asst. Atty. Gen. of Virginia, and Frederick T. Gray, Sp. Asst. Atty. Gen. of Virginia (Robert Y. Button, Atty. Gen. of Virginia, on brief), for appellees and cross-appellants State Board of Education and Superintendent of Public Instruction of Commonwealth of Virginia.

Before HAYNSWORTH, BOREMAN and J. SPENCER BELL, Circuit Judges.

HAYNSWORTH, Circuit Judge.

Transmuted, this old case, in its new flesh and pregnant with questions, comes again before us.

As Davis et al. v. County School Board of Prince Edward et al., D.C., 103 F. Supp. 337, it began in 1951 as a suit to effect the desegregation of the public

schools maintained by Prince Edward County, Virginia. It was one of the four school cases decided by the Supreme Court of the United States in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873. As Allen et al. v. County School Board of Prince Edward County, Virginia et al., the case was again before this Court in 1957[1] and, still again, in 1959.[2]

In our opinion filed in May 1959, when this case was last here, we directed the entry of an injunction requiring the then defendants to receive and consider, on a nondiscriminatory basis, applications by Negro pupils for enrollment in high school for the school term beginning in September 1959. We also directed the entry of an order requiring the School Board to make plans for the elimination of discrimination in the admission of pupils to the elementary schools at the earliest practicable date. On remand to the District Court, no order was entered until April 22, 1960, when the District Court entered a formal order requiring the immediate elimination of discrimination in the admission of Negro applicants to high schools and the formulation of plans for the elimination of discrimination in the admission of applicants to elementary schools. Meanwhile, however, all public schools in Prince Edward County had been closed.

During the summer of 1959, the Board of Supervisors of Prince Edward County, though it had received from the School Board budgets and estimates of the cost of operating the schools for the 1959–1960 school year, did not levy taxes or appropriate funds for the operation of the schools during that year. Though certain funds have come into the hands of the School Board, out of which it has been able to meet certain maintenance and insurance expenses and debt curtailment, it has received no funds with which it could operate the schools, for, annually, the Board of Supervisors has failed, or declined, to levy taxes or appropriate funds for the operation of the schools.

In September 1960, the present plaintiffs obtained leave to file a supplemental complaint, which was supplanted by an amended supplemental complaint filed in April 1961. By these supplemental pleadings, the County Board of Supervisors, the State Board of Education and the State Superintendent of Education were brought in as additional defendants. By the amended supplemental complaint, the plaintiffs sought an order requiring the defendants to operate an efficient system of free public schools in Prince Edward County, forbidding tuition grants to pupils attending private schools practicing segregation, forbidding tax credits to taxpayers for contributions to private schools practicing segregation, and forbidding a conveyance or lease of any property of the School Board of Prince Edward County to any private organization.

The District Court entered an injunction against payment of tuition grants to pupils attending the schools operated by the Prince Edward School Foundation and against the allowance of tax credits by Prince Edward County on account of contributions to that Foundation. Initially, it abstained from deciding the questions of state law upon which the reopening of the free public schools depended, but, after the plaintiffs had aborted the effort to have the relevant questions decided by the state courts,[3] the District

---

1. 4 Cir., 249 F.2d 462.

2. 4 Cir., 266 F.2d 507.

3. The plaintiffs applied to The Supreme Court of Appeals of Virginia for a writ of mandamus to compel the Board of Supervisors to levy taxes and appropriate funds for the operation of public schools. The District Judge saw copies of the pleadings and, apparently, was of the opinion they put in issue all relevant questions. In their printed brief, however, the plaintiffs disclaimed the presence of any federal question, with the result that the court decided only one narrow issue. It held mandamus unavailable because, it concluded, the Board of Supervisors' function was legislative and discretionary, not ministerial, Griffin et al. v. Board of Supervisors of Prince Edward County, 203 Va. 321, 124 S.E.2d 227. It did not consider whether or not

[redacted]

Court undertook to decide them itself. It ordered the schools reopened, but postponed the effectiveness of that order pending this appeal. There was no evidence that anyone had any idea the school buildings and property owned by the School Board would be sold or leased, and no order was entered affecting their disposition.

[redacted] For the District Court to get to the merits, it had to bypass a number of preliminary questions, including the very troublesome question arising under the Eleventh Amendment, all of which are brought up before us. On the merits of each of the three main issues, the parties advanced innumerable alternate offenses and defenses, but it is obvious that the answer on the merits, in one instance exclusively and in other instances largely, rests upon interpretations of state law. It is also apparent that a proceeding in the state courts will avoid most of the technical procedural difficulties which must be disposed of before the merits can be determined in this action. Under these circumstances, we think the District Court properly decided, in the first instance, that it should abstain from deciding the merits of the principal issue until the relevant questions of state law had been decided by the state courts. We think it should have adhered to its abstention when resolution of the state questions by state courts was delayed because the plaintiffs, themselves, chose to withdraw them from state court consideration. We think too that abstention on the other two issues, where the answers are so closely related to the principal issue, was the proper course. Insofar as there are federal questions present which are independent of state law, as will presently appear, we conclude that the plaintiffs have shown no ground for relief, so that abstention is not inappropriate.

In 1959, after the Board of Supervisors of Prince Edward County failed to levy taxes for the operation of the schools during the school year 1959–1960, a corporation known as Prince Edward School Foundation was organized for the purpose of operating private schools in the county. It was launched by private contributions of $334,712.22. With the receipt of tuition charges [4] and continuing private contributions, it has successfully operated primary and secondary schools in Prince Edward County which are attended solely by white pupils. It has used none of the facilities of the School Board. Until the District Judge enjoined their payment, pupils attending schools of the Prince Edward School Foundation, generally, received tuition grants paid jointly by Virginia and Prince Edward County, which approached but did not equal the tuition charges they had to pay.

Negro citizens of Prince Edward County at first made no effort to provide schools for their children. They declined proffered assistance in such an undertaking. Some of their children obtained admission to public schools in other counties of Virginia and, since 1960, obtained, or were eligible for, tuition grants when they did so. The great majority of Negro children, however, for a time, went with no schooling whatever. Later, certain "training schools" were

Virginia or any of its agencies has an affirmative duty to operate free public schools in Prince Edward or whether it can operate public schools elsewhere while those in Prince Edward remain closed. It did not consider many of the questions of state law which underlie those two ultimate questions.

Later the defendants, or some of them, brought an action for a declaratory judgment in the Circuit Court of the City of Richmond. The plaintiffs here were named defendants there, and one of their attorneys was appointed guardian ad litem for the infants. On March 21, 1963 Judge Knowles filed an opinion in which the major questions are resolved in the favor of the agencies and officials of the Commonwealth and county. An appeal has been taken to The Supreme Court of Appeals of Virginia and will be heard in October, a few months hence. See Southern School News, July 1963, Vol. 10, No. 1, page 12.

4. There were no tuition charges during the first year, 1959–1960. That year all expenses were met out of contributions. Since then tuition has been charged.

established and a substantial number of Negro pupils, but far from all, have attended those training schools.

On the principal issue, the question whether the plaintiffs have a judicially enforceable right to have free public schools operated in Prince Edward County, the plaintiffs contend that the closure of the schools, taken either alone or in conjunction with the subsequent formation of the Prince Edward School Foundation and its operation of private schools for white pupils only, was the kind of "evasive scheme" for the perpetuation of segregation in publicly operated schools which was condemned in Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed. 2d 5. The United States, as *amicus curiae* advances a different principle, contending that there is a denial of the Fourteenth Amendment's guarantee of equal protection of the laws when the Commonwealth of Virginia suffers the schools of Prince Edward County to remain closed, while schools elsewhere in the state are operated.

■ As to the plaintiffs' contention, it may be summarily dismissed insofar as it is viewed as a contention that the Fourteenth Amendment requires every state and every school district in every state to operate free public schools in which pupils of all races shall receive instruction. The negative application of the Fourteenth Amendment is too well settled for argument.[5] It prohibits discrimination by a state, or one of its subdivisions, against a pupil because of his race, but there is nothing in the Fourteenth Amendment which requires a state, or any of its political subdivisions with free-

dom to decide for itself, to provide schooling for any of its citizens. Schools that are operated must be made available to all citizens without regard to race, but what public schools a state provides is not the subject of constitutional command.

■ The plaintiffs' theory may also be summarily dismissed insofar as it is viewed as a contention that the closure of the schools was a violation of the order of the District Court entered in compliance with the direction of this Court. The injunctive order, entered when the School Board and its Division Superintendent were the only defendants, required them to abandon their racially discriminatory practices. Without funds, they have been powerless to operate schools, but, even if they had procured the closure of the schools, they would not have violated the order for they abandoned discriminatory admission practices when they closed all schools as fully as if they had continued to operate schools, but without discrimination.

The impact of abandonment of a system of public schools falls more heavily upon the poor than upon the rich. Even with the assistance of tuition grants, private education of children requires expenditure of some money and effort by their parents. One may suggest repetition of the often repeated[6] statement of Anatole France, "The law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread." That the poor are more likely to steal bread than the rich or the banker more likely to embezzle than the poor man, who is not en-

5. Byrd v. Sexton, 8 Cir., 277 F.2d 418, 425; Kelley v. Board of Education of City of Nashville, 6 Cir., 270 F.2d 209, 228–229; School Board of City of Newport News v. Atkins, 4 Cir., 246 F.2d 325, 327; Avery v. Wichita Falls Independent School District, 5 Cir., 241 F.2d 230, 233; Wheeler v. Durham City Board of Education, M.D.N.C., 196 F.Supp. 71, 80, reversed on other grounds, 4 Cir., 309 F.2d 630; Dove v. Parham, E.D.Ark., 181 F.Supp. 504, 513, affirmed in part, reversed in part, 8 Cir., 271 F.2d 132;

McKissick v. Durham City Board of Education, M.D.N.C., 176 F.Supp. 3, 14; Thompson v. County School Board of Arlington, E.D.Va., 144 F.Supp. 239, affirmed School Bd. of City of Charlottesville v. Allen, 4 Cir., 240 F.2d 59; Briggs v. Elliott, E.D.S.C., (Three Judge Court) 132 F.Supp. 776, 777.

6. See Griffin v. Illinois, 351 U.S. 12, 23, 76 S.Ct. 585, 593, 100 L.Ed. 891; Hall v. St. Helena Parish School Board, E.D.La., (Three Judge Court) 197 F.Supp. 649, 655.

trusted with the safekeeping of the moneys of others, does not mean that the laws proscribing thefts and embezzlements are in conflict with the equal protection provision of the Fourteenth Amendment. Similarly, when there is a total cessation of operation of an independent school system, there is no denial of equal protection of the laws, though the resort of the poor man to an adequate substitute may be more difficult and though the result may be the absence of integrated classrooms in the locality.

This we held in a different context in Tonkins v. City of Greensboro, 4 Cir., 276 F.2d 890, affirming D.C., 162 F.Supp. 549. Faced with the necessity of desegregating the swimming pools it owned, the City of Greensboro, North Carolina, chose instead to sell them. Upon findings that the sale of the pool, which the City had theretofore reserved for use by white people only, was bona fide, it was held that there had been no denial of the constitutional rights of the Negro plaintiffs, though the pool was thereafter operated on a segregated basis by its private owners.[7]

Similarly, when a state park was closed during pendency of an action to compel the state to permit its use by Negroes on a nondiscriminatory basis, we held that closure of the park mooted the case requiring its dismissal.[8]

Other courts have clearly held that a municipality which had been ordered to desegregate facilities which it had operated, may abandon the facilities without violating the injunctive order or the rights of the Negro plaintiffs.[9] The only limitation of the principle is that a municipality may not escape its obligations to see that the public facilities it owns and operates are open to everyone on a nondiscriminatory basis by an in-

complete or limited withdrawal from the operation of them. If the municipality reserves rights to itself in disposing of facilities it formerly owned and operated, subsequent operation of those facilities may still be "state action."[10]

Nothing to the contrary is to be found in James v. Almond.[11] There, the Court had ordered the admission of seventeen Negro pupils into six of Norfolk's schools theretofore attended only by white pupils. Under Virginia's "Massive Resistance Laws," the Governor of Virginia thereupon seized the six schools, removed them from Norfolk's school system and closed them. All other schools in Norfolk and elsewhere in Virginia remained open. It was held, of course, that the statutes under which the Governor acted were unconstitutional, for Virginia's requirement that all desegregated schools be closed while segregated schools remained open was a denial of equal protection of the laws. There was no suggestion that Virginia might not withdraw completely from the operation of schools or that any autonomous subdivision operating an independent school system might not do so.

The decision in Hall v. St. Helena Parish School Board[12] is not a departure from the principle. There, it appeared that, confronted with court orders to desegregate schools in certain parishes in Louisiana, the Governor of that State called an extraordinary session of the Legislature, which enacted a number of statutes designed to frustrate enforcement of the court's orders. One of the statutes provided for the closure of all schools of a parish upon a majority vote of the parishioners. It was accompanied by other statutes providing for the transfer of closed schools to private persons or groups, providing for educational co-op-

7. See also City of Greensboro v. Simkins, 4 Cir., 246 F.2d 425.

8. Clark v. Flory, 4 Cir., 237 F.2d 597.

9. Hampton v. City of Jacksonville, 5 Cir., 304 F.2d 319; Gilmore v. City of Montgomery, 5 Cir., 277 F.2d 364; and see Willie v. Harris County, E.D.Texas, 202 F.Supp. 549.

10. Hampton v. City of Jacksonville, 5 Cir., 304 F.2d 320.

11. E. D. Va. (Three Judge Court) 170 F. Supp. 331.

12. E. D. La. (Three Judge Court) 197 F. Supp. 649.

eratives and regulating their operations, providing tuition grants payable directly to the school and not solely to the pupils and their parents, providing for general supervision of the "private schools" by the official state and local school boards, and providing, at state expense, school lunches and transportation for pupils attending the "private schools." Construing all these statutes together, as it was required to do, the Court, with abundant reason, concluded that the statutes did not contemplate an abandonment of state operation of the schools but merely a formal conversion of them with the expectation that the schools would continue to be operated at the expense of the state and subject to its controls. Desegregation orders may not be avoided by such schemes, but there is nothing in the Hall case which suggests that Louisiana might not have withdrawn completely from the school business. It was only because it had not withdrawn that the statutes which composed its evasive scheme of avoidance were struck down.

The plaintiffs largely content themselves with assertions that closure of the schools was motivated by the filing of our opinion in May 1959, from which it was apparent that the District Court would be required to enter a desegregation order. They emphasize a resolution adopted in 1956 by a predecessor Board of Supervisors expressing an intention to levy no tax and appropriate no funds for the operation of desegregated schools.[13] More broadly, they contend that closure of the schools, with the effect of avoiding the operation of integrated schools, is a violation of the Fourteenth Amendment or of the injunctive order.

Facially, what we have said will dispose of the plaintiffs' contention, but the matter does not necessarily end there. As we have seen, if Virginia or Prince Edward County can be said to be still operating schools through the Prince Edward School Foundation, then the principles of Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, would require a remedial order.[14] If Prince Edward County has not completely withdrawn from the school business, then it cannot close some schools while it continues to operate others on a segregated basis.[15]

The plaintiffs do not contend that Prince Edward County or Virginia had a hand in the formation of the Prince Edward School Foundation. There is no suggestion that any agency, or official, of Virginia, or of Prince Edward County, has any authority to supervise the operation of the schools of the Prince Edward School Foundation, except insofar as Virginia exercises a general police supervision over all private schools and except that Virginia accredited the schools of the Foundation when they met the requirements applicable to all private schools. Indeed, during the first year of operation, the schools of the Foundation appear to have been as independent of governmental authority as any sectarian or nonsectarian private school in Virginia.

Beginning with the school year 1960–1961, pupils attending schools of the Foundation did receive tuition grants. One of Virginia's statutes [16] providing for the tuition grants authorized participation by the counties. If a particular county does not participate in the tuition grant program, the state will pay the maximum allowable grant but will deduct a portion of its payment from other state funds distributed for purposes unrelated to schools to the nonparticipating

13. One of the questions much debated is whether a court may inquire into the motive of a legislative body when it considers the constitutionality of the legislative body's acts or inaction.

14. See Hall v. St. Helena Parish School Board, E.D.La., (Three Judge Court) 197 F.Supp. 649; Hampton v. City of Jacksonville, 5 Cir., 304 F.2d 320; City of Greensboro v. Simkins, 4 Cir., 246 F. 2d 245.

15. James v. Almond, E.D.Va. (Three Judge Court) 170 F.Supp. 331.

16. Code of Virginia § 22–115.31 (1960 Cum.Supp.)

county.[17] It was apparently for that reason that in 1960 the Board of Supervisors of Prince Edward County provided for tuition grants which would take the place of a portion of the state grant but would not supplement the funds otherwise available to the pupil. In its effect upon Prince Edward County, its participation in the state-wide program of tuition grants amounted to no more than taking dollars from one of its pockets and putting them into another. As for pupils who were residents of Prince Edward County attending schools of Prince Edward Foundation, or any private school, or a public school outside of the county, they got no more by reason of the county's participation in the program.

In 1960, the Board of Supervisors of Prince Edward County also adopted an ordinance providing for credits to taxpayers, not exceeding twenty-five per cent of the total tax otherwise due, for contributions to nonsectarian schools not operated for profit located in Prince Edward County, or to be established and operated in that county during the ensuing year. During the school year 1960–1961, credits aggregating $56,866.-22 were allowed by Prince Edward County on account of contributions made to the Foundation.

The allowance of such tax credits appears to be an indirect method of channeling public funds to the Foundation. They are very unlike Virginia's program of tuition grants to pupils which has a lengthy history.[18] The allowance of such tax credits makes uncertain the completeness of the County's withdrawal from the school business. It might lead to a contention that exclusion of Negroes by schools of the Foundation is county action. Their allowance, however, during the second [19] of the four years that the Foundation has operated its schools does not require a present finding on this record that the County is still in the school business, and that the acts of the Foundation are its acts.

Bearing in mind the fact that the Foundation established and operated its schools without utilization of public facilities and, during the first year, without any direct or indirect assistance of public funds, and the clear showing of the independence of the Foundation from the direction and control of the defendants, the allowance of the tax credits is at least equivocal. Inferences of power to influence, if not to control, may follow such encouragement of contributions, though the allowance of income tax deductions by the State and United States for contributions to religious and charitable organizations is not thought to make state or nation a participant in the affairs and operations of the beneficiaries of the contributions. Indeed, their allowance has come in recognition of public interest in encouragement of private contributions to religious, educational and charitable institutions and organizations. Here, however, the allowance of the tax credit comes in a more particularized context, and that context is not complete without consideration of Virginia's tuition grants.

As indicated above, Virginia's tuition grants had a considerable history. That program has not been attacked in this case. Its constitutionality has not been

17. Code of Virginia § 22–115.34 (1960 Cum.Supp.)

18. Virginia's tuition grant program had its first beginning many years ago in aid of children who had lost their fathers in World War I. It was expanded to include others until 1955 when the Supreme Court of Appeals of Virginia held that the tuition grants were in violation of Virginia's Constitution when given to pupils attending private schools. Almond v. Day, 197 Va. 419, 89 S.E.2d 851.

Section 141 of Virginia's Constitution was promptly amended to overturn the result of Almond v. Day. The statutes authorizing Virginia's present, broad program of tuition grants were enacted in 1960.

19. In the first year of the Foundation's operation, the County had no provision for any tax credits for contributions. After the second year, no such credits were allowed because of the Court's order.

questioned. Elsewhere, apparently, it has not been utilized to circumvent the segregation of public schools. In the school year just closed, thirty-one school districts in Virginia were desegregated to some degree.[20] The basic program of tuition grants, however, its antecedents and its operation and effect were not examined by the court below.[21]

Moreover, the effect of tax credits and tuition grants ought to be determined only in the light of the correlative duties and responsibilities of the Commonwealth and the County in connection with the operation of schools in the County. What they are and how they are distributed turn entirely upon the proper construction of a number of constitutional and statutory provisions of the Commonwealth. If, as the District Court found, Virginia's Constitution requires the Commonwealth as such to open and operate schools in Prince Edward County, what Prince Edward County does in the allowance of tax credits for contributions to otherwise independent educational institutions may be of little moment. On the other hand, if Prince Edward County should be held to have a duty under state law to operate free public schools, then its allowance of tax credits might be a basis for a conclusion, in light of the tuition grant program, that it was undertaking to discharge its duty by indirection and, in effect, was operating the schools of the Foundation.

■ Such a determination can be made only when the underlying questions of state law have been settled.

The two branches of the principal issue are closely interrelated. As appears above, the question of whether or not

Prince Edward County, or Virginia, has such a hand in the operation of the schools of the Foundation as to result in a Fourteenth Amendment requirement that they operate free, public schools on a nondiscriminatory basis for all pupils in the county is dependent, in large measure, upon a determination of Virginia's distribution of authority, duty and responsibility in connection with the schools and their control and operation. Applicability of the principle advanced by the United States as *amicus curiae* depends entirely upon the answers to those questions of state law, for no one questions the principle that if Virginia is operating a state-wide, centralized system of schools, she may not close her schools in Prince Edward County in the face of a desegregation order while she continues to operate schools in other counties and cities of the Commonwealth. Application of the constitutional principle turns solely upon a determination, under state law, of Virginia's role in the operation of public schools in Virginia.[22]

The answers to these questions are unresolved and unclear. On the one hand, the United States points to Section 129 of Virginia's Constitution, which provides, "The General Assembly shall establish and maintain an efficient system of public free schools throughout the State," and to those constitutional and statutory provisions providing for a State Board of Education and a Superintendent of Public Instruction, and defining their duties and responsibilities. On the other hand, the defendants point to Section 133 of Virginia's Constitution which provides that supervision of schools in each county and city shall be vested in a school board and to other constitutional and statutory provisions which, unquestionably, vest

20. Southern School News, June 1963, Vol. 9, No. 12, page 1.

21. It enjoined payment of tuition grants by the state because it construed the state statutes as not authorizing them, a construction which we find, at least, dubious.

22. Here, the Eleventh Amendment question arises. The more the United States as-

serts that Virginia's Constitution places affirmative, but neglected duties upon Virginia's General Assembly and State Board of Education, the closer it skirts the Eleventh Amendment's prohibition against suits in the courts of the United States by citizens against a state.

large discretionary power in local school boards and in the governing bodies of the counties and cities in which they function.

By Section 130 of the Constitution, the State Board of Education has "general supervision of the school system." It has the power to divide the state into school divisions, though no school division may be smaller than one county or one city. When a Division Superintendent of Schools is to be appointed, the State Board of Education certifies to the local board a list of qualified persons, and the local board may appoint anyone so certified. It selects and approves textbooks for use in the schools. It is required to manage and invest certain school funds of the state, and the General Assembly is empowered to authorize the State Board to promulgate rules and regulations governing the management of the schools.

Section 135 of Virginia's Constitution requires the application of receipts from certain sources to schools of the primary and grammar grades. These "constitutional funds" are apportioned among the counties and cities according to school population. In addition, the General Assembly is authorized to appropriate other funds for school purposes, and those funds are apportioned as the General Assembly determines. Section 136 of the Constitution authorizes the counties and towns to levy taxes and appropriate funds for use "in establishing and maintaining such schools as in their judgment the public welfare may require."

The General Assembly of Virginia has adopted the consistent practice of appropriating funds, other than the "constitutional funds," for distribution to the counties and cities for school purposes. Such appropriations are conditioned upon local appropriations. Thus, before the schools in Prince Edward County were closed, the local school board received its proportion of the constitutional funds, and, in addition, it received whatever funds were appropriated by Prince Edward's Board of Supervisors, plus matching funds from the state which became

payable because of the local appropriation. Since the schools were closed, the Prince Edward County School Board received no funds from the state during the school year 1959–1960. It has received its proportionate part of the constitutional funds, but those only, in subsequent years, and these are the funds it has used to keep its physical properties in repair and insured, but they have been insufficient to enable it to do anything else.

This arrangement, the defendants say, is a local option system under which each county is authorized to determine for itself whether or not it will operate any schools and, if so, what schools and what grades. They emphasize the provision of Section 136 of the Constitution which gives the local authorities the right to appropriate funds "in establishing and maintaining such schools as in their judgment the public welfare may require," which is limited by a provision that, until primary schools are operating for at least four months per year, schools of higher grades may not be established. This, they say, clearly authorizes and requires what is done in practice. The local school board, it is said, determines what schools and facilities are required. It budgets the estimated costs of their maintenance and operation, and submits its estimates to the local Board of Supervisors. The Board of Supervisors may not overturn particular determinations of the school board, but it, say the defendants, has an unfettered discretion in levying taxes and appropriating funds. It may appropriate funds equal to the school board's budgetary estimate, but it also may appropriate less or nothing at all. If the Board of Supervisors appropriates nothing for use by the school board, then the matching state funds are unavailable and the schools cannot be operated.

Among Virginia's statutes may be found clear provisions for local option. Under Sections 16.1–201, 16.1–202 of the Virginia Code, a county may elect to establish juvenile detention facilities. If it does so, the state will contribute funds

to meet, in part, the cost of construction and operation. Under Section 32–292 et seq., a county may elect to participate in a program of state-local hospitalization. If a county elects to do so, the state, with certain limitations, will contribute one-half the cost of such hospitalization. The defendants suggest that there is no unconstitutional geographic discrimination in such local option programs, though one or more counties may not elect to participate in them.

Federal analogies readily come to mind. The United States makes available to participating states which enact prescribed legislation, grants for unemployment compensation administration.[23] Under the National Defense Education Act,[24] federal funds are made available to localities conducting in their schools approved programs of science, mathematics and foreign languages. It is suggested that there is no geographic discrimination in the provision for such optional grants, though a state or locality may exercise its option not to participate.

Such local option provisions as those the defendants think analogous are constitutionally unassailable.[25] When a state undertakes to encourage local conduct of educational or social programs by making matching funds available to participating localities, there is no discrimination against nonparticipating localities. Since every locality may participate if it wishes to do so, and the state funds are available to each upon the same conditions, the state is even-handed.

The question here, however, is whether Virginia's school laws establish an arrangement within the local option principle the defendants advance. If Section 129 of Virginia's Constitution imposes upon the General Assembly the duty to provide operating, free, public schools in every county, as the United States contends, its election to establish a system having features of a local option arrangement may be permissible under state law only so long as schools are operated in every county. On the other hand, if Section 129 of Virginia's Constitution, construed in the light of other constitutional provisions, requires of the General Assembly only that it provide for a system of education under which counties and cities are authorized to establish and maintain schools of their own with state assistance, then the principle which the defendants assert may be applicable. The answer is unclear. It requires interpretation and harmonization of Virginia's Constitution and statutes.

The question is unresolved. Virginia's Supreme Court of Appeals has considered her school laws in a number of cases, but none of them settle the question here.

In School Board of Carroll County v. Shockley, 160 Va. 405, 168 S.E. 419, the Court held unconstitutional an act of the General Assembly requiring the imposition of local taxes and the use of the proceeds in the construction of a particular school.[26] In Board of Supervisors of Chesterfield County v. School Board of Chesterfield County, 182 Va. 266, 28 S.E.2d 698, the Court said that the local school board is "to run the schools," and it alone has the power to determine how locally appropriated funds are to be spent. In Griffin v. Board of Supervisors of Prince Edward County, 203 Va. 321, 124 S.E.2d 227, the Court held that in levying taxes and appropriating funds for school purposes, the Board of Supervisors exercised a legislative and discretionary function, and that it was not subject to mandamus. In Scott County School Board v. Scott County Board of Supervisors, 169 Va. 213, 193 S.E. 52,

---

23. 42 U.S.C.A. § 501 et seq.

24. 20 U.S.C.A. § 401 et seq.

25. Salsburg v. Maryland, 346 U.S. 545, 74 S.Ct. 280, 98 L.Ed. 281; Ohio ex rel. Lloyd v. Dollison, 194 U.S. 445, 24 S. Ct. 703, 48 L.Ed. 1062; Rippey v. Texas,

193 U.S. 504, 24 S.Ct. 516, 48 L.Ed. 767; Ft. Smith Light & Traction Co. v. Board of Improvement, 274 U.S. 387, 47 S.Ct. 595, 71 L.Ed. 1112.

26. See also Almond v. Gilmer, 188 Va. 1, 49 S.E.2d 431.

it had been held that mandamus was not available to a school board to compel the supervisors of its county to appropriate funds sufficient to cover the school board's estimates of the cost of school operation.

In none of those cases, however, has Virginia's Supreme Court of Appeals considered the requirements of Section 129 of the Constitution when schools cease to operate because the local Board of Supervisors levies no taxes and appropriates no funds for the purpose. That Court may conclude that, in light of the closure of the schools in Prince Edward County, Section 129 of the Constitution requires something more of the General Assembly or of the State Board of Education.

That conclusion, however, is not forecast by Harrison v. Day, 200 Va. 439, 106 S.E.2d 636, in which Virginia's Supreme Court of Appeals struck down Virginia's massive resistance laws. Nor is there anything in the Three-Judge Court decision of James v. Almond, E.D.Va., 170 F.Supp. 331, which approaches federal determination of this state question. There, the Governor seized and removed from the school system six of Norfolk's schools subject to desegregation orders. He acted under color of a state statute which required him to do so. In holding the statute unconstitutional the Court did not decide that all schools in Virginia were administered by the state on a statewide, centralized basis. The seizure was clearly that of the Governor and the discrimination was inherent in the statute whether the schools were otherwise operated upon a local option basis or directly by the state. When the state acts to seize and close every school subject to a desegregation order, its sufferance of continued operation of other schools within its borders is as discriminatory as its direct operation of them.

These controlling questions of state law, uncertain and unsettled as they are, ought to be determined by the Supreme Court of Appeals of Virginia, which alone has the power to give an authoritative interpretation of the relevant sections of Virginia's Constitution and of her statutes. As it was so forcefully said in Railroad Commission of Texas v. Pullman Company, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971, this Court cannot settle the state questions; it can do no more than predict what Virginia's Supreme Court of Appeals will do when the questions come before it. If we should hazard a forecast and it should be proven wrong, any present judgment based upon it will appear both gratuitously premature and empty when the state questions are authoritatively resolved in the state courts. Particularly is this true when, with so little to guide us, we cannot predict with any semblance of confidence how the several state questions will be ultimately resolved in the state courts. In such circumstances, abstention until the state questions are determined is the proper course.[27]

Abstention, under the circumstances, is all the more appropriate because the case of County School Board of Prince Edward County, Virginia et al. v. Griffin et al., is already pending on the docket of the Supreme Court of Appeals of Virginia and will be heard by that Court in October. From a reading of the opinion of the Circuit Court of the City of Richmond in that case, it appears that the essential questions of state law upon which decision here turns are presented in that case and will be determined by that Court as it considers and adjudicates the same primary question tendered in this case, the existence of judicially enforceable rights in the plaintiffs to have the schools reopened. That state court proceeding had not been commenced when the District Judge acted on the primary question in this case. In abandoning his earlier decision to abstain, he referred to the fact that no such proceeding was

---

27. Railroad Commission of Texas v. Pullman Company, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971; Harrison v. N.A.A. C.P., 360 U.S. 167, 79 S.Ct. 1025, 3 L. Ed.2d 1152; Spector Motor Service, Inc. v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101.

pending or then contemplated. Had it been then pending, he probably would have awaited its outcome. The fact that a case, apparently ripe for decision, is now pending on the docket of Virginia's Supreme Court of Appeals, makes easier our conclusion that the controlling questions of state law, which govern the application of unquestioned constitutional principles, ought to be determined by the state courts, and that, when they may be so determined, the federal courts ought to abstain from constitutional adjudication premised upon their notions of state law which may or may not turn out to be accurate forecasts.

Accordingly, the judgments below will be vacated and the case remanded to the District Court, with instructions to abstain from conducting further proceedings until the Supreme Court of Appeals of Virginia shall have decided the case now pending on its docket entitled County School Board of Prince Edward County, Virginia et al. v. Leslie Francis Griffin, Sr. et al., and that decision has become final, with leave to the District Court thereafter to entertain such further proceedings and to enter such orders as may then appear appropriate in light of the determinations of state law by the Supreme Court of Appeals of Virginia.

Vacated and remanded.

J. SPENCER BELL, Circuit Judge (dissenting).

Because of the inordinate delays which have already occurred in this protracted litigation, I hasten, without exhausting the subject, to indicate the reasons for this dissent.

I think the order of the District Court should be implemented at once for either of two reasons, each of which is amply supported by the findings of fact and the conclusions of law set forth in the District Court's opinion. First, because the public school system of Virginia is maintained, supported and administered on a statewide basis by the Commonwealth of Virginia; therefore, the closure of the schools of this one county constitutes discrimination. Second, the defendants closed the schools solely in order to frustrate the orders of the federal courts that the schools be desegregated.

The plaintiffs assert a federal right guaranteed by the Constitution; the jurisdiction to determine this right is vested in the federal courts. A refusal to adjudicate this right would be violation of the courts' duty. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L. Ed.2d 492 (1961). The plaintiffs must not be required to exhaust their remedies in the state's courts before having their federal rights determined in the federal courts. McNeese v. Board of Education, 83 S.Ct. 1433. The defendants have been given ample opportunity heretofore to have the state courts speak. In its opinion of July 25, 1962, the district court said:

" * * * upon the further assurance of counsel for the Board of Supervisors of Prince Edward County (which assurance was given after conferring with the Attorney General of Virginia and counsel for the School Board of Prince Edward County) that he would file such a suit if the petitioners failed to do so, this court abstained from determining the issue, pending a final ruling by the Supreme Court of Appeals of Virginia."

In spite of this assurance the defendants not only failed to bring a suit for this purpose, but they deliberately failed to raise the issue in a suit brought by the plaintiffs to assert their rights under the Virginia Constitution. Finally, at long last, when the district court proceeded to declare the plaintiffs' rights under federal law, the defendants commenced the suit to raise the issue in the state courts, demanding that the federal courts further abstain. This is not abstention—this would be a humble acquiescence in outrageously dilatory tactics, and the district court was right to reject it. We have neither the duty nor the right to pressure the state courts

to declare federal rights, and they are not bound by conscience or law to engage in a race with the federal courts to declare federal rights.[1] Courts are not self-activating, if the defendants here chose to refrain from seeking a state court determination until the district court was finally forced to act, they should not now be heard to call for further abstention—when as the district court said on October 10, 1962: "Abstention would create an irreparable loss in the formal education of the children of Prince Edward County". Abstention is not sanctioned by any law—it is a court evolved doctrine of courtesy—it must not be used to frustrate the plain rights of litigants. To do so now under the present posture of this case is not abstention, it is abnegation of our plain duty.

A brief review of the record leaves no doubt whatsoever that the public schools of Virginia were established and are being maintained, supported and administered in accordance with state law, primarily on a statewide basis. I see no need to review in detail the evidence supporting that conclusion. The Constitution of the state compels the Legislature to appropriate funds for this purpose—funds derived from the taxation of Negroes as well as whites in Prince Edward and other counties. The Virginia Code provides that the public free school system shall be administered by a State Board of Education which is responsible for dividing the state into appropriate school divisions. The State Board prescribes the rules and regulations for conducting the high schools as well as the requirements for admission. A Superintendent of Public Instruction is appointed by the Governor. Local school boards are regulated to a great extent by state law. All power of enrollment or placement of pupils in the public schools is vested in a State Pupil Placement Board, whose members likewise are appointed by the Governor. I do not believe that it can be seriously

argued that public education is not a state function in Virginia. This being true, since the state maintains and operates schools elsewhere in the state, its failure to do so in Prince Edward County, by permitting the County Board of Supervisors to close the schools for a discriminatory reason, violates the Fourteenth Amendment.

The district court's finding that Virginia is operating and maintaining a statewide system of schools not being clearly erroneous is binding on us. Indeed it is a fact so firmly established that we would be required to take judicial notice of it. That decision is buttressed by the decision of the three judge district court in James v. Almond, 170 F.Supp. 331, 337 (E.D.Va.1959), wherein the court said:

> "Tested by these principles we arrive at the inescapable conclusion that the Commonwealth of Virginia, having accepted and assumed the responsibility of maintaining and operating public schools * * * [cannot close one or more because of segregation] * * *. While the State of Virginia, directly or *indirectly* maintains and operates a school system with the use of public funds, *or participates by arrangement or otherwise* in the management of such a school system [it may not close schools to avoid segregation]." (Emphasis added).

It is worthy of note that the Supreme Court of Appeals of Virginia points to the mandatory provisions of Section 129 of that state's Constitution, which provides: "The General Assembly shall establish and maintain an efficient system of public free schools throughout the State". Griffin v. Board of Supervisors of Prince Edward Co., 203 Va. 321, 124 S.E.2d 227.

Faced with the inescapable fact that the State of Virginia is maintaining and operating a statewide system of schools, the deeply abstruse and highly technical

---

1. The Supreme Court of Appeals of Virginia refused last June to put the case ahead on its calendar.

arguments about whether Virginia's laws permit a local unit to close its schools are academic under the Fourteenth Amendment. For this purpose the county is acting as an agency of the state, and the state may not directly or indirectly evade the command of the Amendment. What the state could not do directly in James v. Almond it may not do indirectly in this case. In Hall v. St. Helena Parish School Board, D.C., 197 F.Supp. 649, aff'd. 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed.2d 521 (three judge court), the State of Louisiana attempted to set up a local option system to avoid a court order to desegregate. The court struck down the law and forbade the practice. In doing so it said:

"The equal protection clause speaks to the state. The United States Constitution recognizes no governing unit except the federal government and the state. A contrary position would allow a state to evade its constitutional responsibility by carve-outs of small units. At least in the area of declared constitutional rights, and specifically with respect to education, the state can no more delegate to its subdivisions a power to discriminate than it can itself directly establish inequalities. When a parish wants to lock its school doors, the state must turn the key. If the rule were otherwise, the great guarantee of the equal protection clause would be meaningless."

And this court in an opinion concurred in as to this point by every member of the court, including the members of the present panel, in the case of Bell v. School Board of Powhatan Co., 4 Cir., 321 F. 2d 494, said of the School Board of that Virginia County:

"They are not told to exercise powers they do not have; they are merely forbidden to take any steps themselves toward the closing of the schools, and *this injunction is necessary to prevent a violation of the equal protection clause of the Fourteenth Amendment.*" (Emphasis added).

Whether the local unit is ordered to close its schools or permitted to do so under state law is immaterial, so long as the state directly or indirectly participates in the operation of a statewide system of schools.

Nor do I think this suit is barred by the Eleventh Amendment to the Constitution of the United States. It is well settled that a suit against a political subdivision of a state, such as a county, is not barred by the Eleventh Amendment. The leading decision in Lincoln County v. Luning, 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890), where the point was urged that the county is an integral part of the state and could not, therefore, be sued under the Eleventh Amendment. The Supreme Court said:

"* * * [I]t may be observed that the records of this court for the last thirty years are full of suits against counties, and it would seem as though by general consent the jurisdiction of the Federal courts in such suits ha[s] become established."

In Kennecott Copper Corporation v. State Tax Comm., 327 U.S. 573, 66 S.Ct. 745, 90 L.Ed. 862 (1946), the Supreme Court again held that consent was not necessary for suits against counties and municipalities. In short, insofar as the Eleventh Amendment is concerned a suit in equity to compel affirmative action by a county through its Board of Supervisors is maintainable for the simple reason that a county as such is not a "state" within the meaning of the constitutional prohibition. I am aware of those cases cited which invoke the constitutional bar if the subsidiary political unit bears such a relationship to the state in the particular function involved as to constitute it an agent of the state with respect to that function. They do not apply in this case. This court has recently discussed this distinction in Duckworth v. James, 267 F.2d 224 (4

Cir., 1959), cert. denied 361 U.S. 835, 80 S.Ct. 88, 4 L.Ed.2d 76. There it was held that an injunction would lie to restrain the City of Norfolk from withholding funds from the Norfolk School Board. It is the state scheme itself which provides that part of the essential operating revenue must come from the taxes levied by local boards. The words of this court in Duckworth v. James, supra, are pertinent:

"The present case falls within the class of cases where a public officer or agent makes use of his authority to perform an illegal act by invoking the command of an unconstitutional statute or *seeks to carry out a valid statute in an unconstitutional manner*. (Emphasis added). In such cases, it is held that his action is not the act of the state but the act of an individual, which may be restrained by the injunctive power of the Federal court."

Neither am I impressed with the argument that the district court has no power to compel a levy of taxes for a monetary appropriation by the defendant Board of Supervisors should it fail to obey the mandate of the district court. It should be enough to cite Virginia v. West Virginia, 246 U.S. 565, 38 S.Ct. 400, 59 L. Ed. 1272 (1918). There the defense was advanced by West Virginia that the judicial power of the United States did not extend to the coercing of a judgment by a decree requiring a tax to be levied. The opinion of the court is plain in its implication that West Virginia could be compelled to pay if compulsion were the only way to accomplish the result. But it is necessary here only to decide whether the subdivision of the state (Prince Edward County) may be required to provide the funds necessary to comply with the judgment. There can be no doubt that the judicial power may enforce the levy of a tax to meet a judgment rendered. Labette County Commissioners v. Moulton, 112 U.S. 217, 5 S.Ct. 108, 28 L.Ed. 698 (1884). See also Graham v. Folsom, 200 U.S. 248, 26 S.Ct. 245, 50 L.Ed. 464 (1906). It

is to be noted that the Supreme Court of Appeals of Virginia in Griffin v. Board of Supervisors of Prince Edward County, 203 Va. 321, 124 S.E.2d 227 (1962), did not consider whether under federal law the County Board could be compelled to levy taxes and appropriate funds for the operation of the county public school system. The Virginia law does not prohibit the Supervisors from levying the taxes and appropriating the revenue, it merely vests in them the power to decide whether this shall be done. In City of Galena v. Amy, 72 U.S. (5 Wall.) 705, 18 L.Ed. 560 (1866), a suit was brought in a federal court to recover interest on bonds. The Supreme Court required that discretionary taxing power be exercised in a particular manner. I think that under federal constitutional law an affirmative order is appropriate here notwithstanding the unavailability of mandamus under Virginia law. The County Board has the unquestionable power to levy the taxes; the schools of this County may not remain closed while the state maintains a school system elsewhere.

Finally, the Board of Supervisors of Prince Edward County closed the public schools for the sole purpose of avoiding compliance with the decree of this court. The district court so found. The Board publicly proclaimed its intention and purpose by its resolution dated May 3, 1956:

"Be It Resolved, That the Board of Supervisors of Prince Edward County * * * do hereby declare it to be the policy and intention of the said Board * * * that no tax levy shall be made * * * nor public revenue derived from local taxes * * * be appropriated for the operation and maintenance of public schools in said county wherein white and colored children are taught together under any arrangement or plan whatsoever."

This was the defiant response to the decision of the Supreme Court in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), ap-

348

plying expressly to the schools of Prince Edward County. The district court found that it was passed in anticipation of our decision in 1959 that desegregation in compliance with Brown should commence in the fall of 1959. In the factual context of this case I cannot agree with the majority that this was a permissible compliance with the Supreme Court's order. The law has long been settled that such conduct violates the Fourteenth Amendment and may be enjoined. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5; Aaron v. Cooper, 261 F.2d 97 (8 Cir., 1958); James v. Duckworth, 170 F.Supp. 342 (E.D.Va. 1959); James v. Almond, 170 F.Supp. 331 (E.D.Va.1959); Aaron v. McKinley, 173 F.Supp. 944 (E.D.Ark.1959), aff'd sub nom. Faubus v. Aaron, 361 U.S. 197, 80 S.Ct. 291, 4 L.Ed.2d 237; Bush v. Orleans Parish School Board, 190 F. Supp. 861 (E.D.La.1960). Equal educational opportunity through access to non-segregated public schools is secured by the Constitution. The state has an affirmative duty to accord to all persons within its jurisdiction the benefits of that constitutional guarantee. Taylor v. Board of Education, 294 F.2d 36 (2 Cir., 1961). Indeed Congress regarded so highly the duty of maintaining public schools that when it readmitted at least three Confederate states, Virginia, Mississippi and Texas, it specifically required that their constitutions:

"* * * shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the school rights and privileges secured by the constitution of said State." 16 Stat. 62, 67 and 80 (1870).

It is tragic that since 1959 the children of Prince Edward County have gone without formal education. Here is a truly shocking example of the law's delays. In the scales of justice the doctrine of abstention should not weigh heavily against the rights of these children.