## Richmond

COUNTY SCHOOL BOARD OF PRINCE EDWARD COUNTY, VIRGINIA, ET
AL. v. LESLIE FRANCIS GRIFFIN, SR., ET AL.

December 2, 1963.

Record No. 5709.

Present, All the Justices.

The opinion states the case.

*Collins Denny, Jr. (John F. Kay, Jr.; C. F. Hicks; Denny, Valentine & Davenport; DeHardit, Martin & Hicks*, on brief), for the appellants.

*R. D. McIlwaine, III, Assistant Attorney General* and *Frederick T. Gray, Special Assistant Attorney General (Robert Y. Button, Attorney General,* on brief),. for appellees, State Board of Education and Superintendent of Public Instruction.

*S. W. Tucker, Guardian ad litem,* for infant appellees.

*Frank Nat Watkins, Commonwealth's Attorney for Prince Edward County,* and *J. Segar Gravatt,* Special Counsel for Board of Supervisors of Prince Edward County,. amicus curiae.

BUCHANAN, J., delivered the opinion of the court.

This is a declaratory judgment proceeding (Code §§ 8-578 *ff.*) brought in August 1962 by the County School Board and the Division Superintendent of Schools of Prince Edward county, plaintiffs, to obtain adjudication of rights, duties and responsibilities with respect to the operation of public free schools in Prince Edward county.

The defendants named were Leslie Francis Griffin, Sr., James L. Carter and Warren A. Reid and their infant children, respectively, Leslie Francis Griffin, Jr.,. Betty Jean Carter, and Jacquelyn Reid, eligible to attend public schools in the county. They will be herein referred to as the individual defendants. Also made defendants were the State Board of Education and the Superintendent of Public Instruction.

In general the bill alleged that the individual defendants (who are members of the Negro race) were asserting that plaintiffs and the State Board of Education and Superintendent of Public Instruction have the duty and responsibility under the Virginia Constitution and laws and the Fourteenth Amendment to establish, maintain and operate public free schools in Prince Edward county, which they have failed to do; that failure to operate such schools violates their constitutional rights; that State scholarship grants in aid of private elementary and secondary education may not be made to parents of children in Prince Edward county so long as public schools there remain closed; and that the plaintiffs and State Board of Education and Superintendent of Public Instruction acquiesced in the refusal of the Board of Supervisors of Prince Edward county to make any levy or appropriate any money for the operation of public schools in the county.

Plaintiffs alleged that there is no duty on them or the State Board of Education or Superintendent of Public Instruction to operate schools unless funds are appropriated therefor, that no local or matching school funds were appropriated to them for operation of schools in Prince Edward county after the 1958-59 school term, and that the closing of public schools in Prince Edward county violates no rights of the individual defendants.

Plaintiffs alleged that the Division Superintendent and County School Board had submitted the estimates of the money needed for the school years 1959-60 through 1962-63 for public schools and for education purposes to the Board of Supervisors with the request that it fix the levy and make appropriations of the funds needed for the operation of said schools as required by Code § 22-120.3 and § 22-120.4; that the Board of Supervisors, however, had refused to levy any tax or make any appropriation for the operation of public schools for said school years and for those years no public schools were operated in the county and so far as the plaintiffs were aware, no funds would be available to them with which to operate public schools for the year 1962-63, although public schools during said years were operated by the local school boards in other localities in the State.

Plaintiffs also alleged that the State Board of Education and Superintendent of Public Instruction are asserting that the plaintiffs may not use any funds appropriated to them under § 135 of the Virginia Constitution for the upkeep of any high school in Prince Edward county. Plaintiffs assert that they can use such funds for the upkeep of any school.

The bill further alleged that plaintiffs and the State Board of Education and the Superintendent of Public Instruction have no power or authority and no funds to establish, maintain and operate public schools in Prince Edward county, and that they have performed all the duties and responsibilities imposed upon them by the State Constitution and laws and by the Fourteenth Amendment.

The State Board of Education and the Superintendent of Public Instruction filed their answer asserting that under the facts and circumstances alleged they have no power and no duty to establish, maintain and operate public free schools in Prince Edward county, and that they have no funds with which to do so; and that they have not, either individually or in conjunction with the plaintiffs, acquiesced in the refusal of the Board of Supervisors to levy taxes

and appropriate money for the operation of public schools in said county.

No answer was filed by the individual adult defendants. The guardian *ad litem* for the infant defendants filed a motion to dismiss and an answer demanding strict proof of the allegations of the bill.

The case was heard *ore tenus* upon the pleadings, exhibits and the testimony of county and State school officials. The trial court delivered a comprehensive and carefully considered written opinion in which he found, so far as now material, the following facts, which are clearly supported by the evidence:

(1) Plaintiffs complied with § 22-120.3 and § 22-120.4 of the Code and made estimates of funds needed for public schools and for public educational purposes, and requested the Board of Supervisors to make the necessary levy or appropriation for each of the school years 1959-60, 1960-61, 1961-62 and 1962-63.

(2) The Board of Supervisors of Prince Edward county refused to make any levy or appropriate any funds for the operation of public schools for the years 1959-60 through 1962-63, and as a result of lack of funds no public free schools were operated by the County School Board during those years.

(3) The County School Board expended in the upkeep of the county high schools a part of the "constitutional minimum" appropriation for primary and grammar schools required by § 135 of the State Constitution. For the school year 1960-61 the County School Board expended approximately $3,749.15, and for the year 1961-62 approximately $12,662.95, from these funds on two high school buildings.

(4) During the school year 1959-60 Prince Edward county's proportionate share of the "constitutional minimum" funds under § 135 of the Constitution were earmarked for teachers' salaries by the appropriation act (Item 139, ch. 96, Acts 1950, Ex. Sess.). No public free schools being in operation in the county during that year and no teachers being employed, the county's share of this fund reverted to the general fund of the Commonwealth.

(5) For 1959-60 no State or county scholarship grants were paid to Prince Edward county parents; for 1960-61, 1,332 State grants and 1,363 county grants were paid.

(6) Neither the plaintiffs nor the State Board of Education nor the Superintendent of Public Instruction acquiesced in the refusal of the Board of Supervisors of Prince Edward county to make funds available for the operation of public schools.

(7) No public free schools have been operated in Prince Edward county since the end of the 1958-59 school year. Since 1959 Prince Edward School Foundation, a private enterprise, has operated private, nonsectarian schools in the county. Since 1959 public schools have been in operation in other localities of Virginia.

The decree appealed from was entered on April 10, 1963, which overruled the motion of the guardian *ad litem* to dismiss and adjudicated as follows:

(1) that the plaintiffs have performed all the duties incumbent upon them, and have not acquiesced in the refusal of the Board of Supervisors to levy taxes for public school purposes; and have also exercised all their legal powers with respect to the establishment and operation of public free schools in Prince Edward county;

(2) that the State Board of Education and Superintendent of Public Instruction have no power or duty to establish, maintain or operate public free schools, have performed all duties legally incumbent upon them with respect to said schools, and have not acquiesced in the refusal of the Board of Supervisors to levy taxes for public schools; that except for the minimum funds under § 135 of the Virginia Constitution, these officials cannot apportion and cause to be paid over to any locality any portion of the funds appropriated by the General Assembly for public school purposes unless and until the matching sums, upon the availability of which the payment of such State funds is conditioned, are provided by the Board of Supervisors;

(3) that neither the United States Constitution nor Federal law requires a State to operate public schools, and none of the actions or inabilities to act of the plaintiffs or the State Board of Education or Superintendent of Public Instruction has violated any rights secured to the individual defendants by the Fourteenth Amendment;

(4) that payment of State scholarship grants to Prince Edward county parents is not conditioned upon the operation of public schools in Prince Edward county;

(5) that Article IX of the Virginia Constitution and statutes enacted pursuant thereto establish a local option or home rule system of public free schools in which the operation of the schools is left to the determination of the local authorities. Receipt of State funds (with the exception of the "absolute appropriation" under § 135 of the Constitution) is conditioned by law upon appropriation of local funds. The election of the governing body of Prince Edward county not to appropriate local funds for public schools and the consequent

non-operation of public schools does not violate either the laws or Constitution of Virginia or the Constitution of the United States; and

(6) that expenditure of State funds derived under § 135 of the Constitution for the upkeep of high schools is in violation of § 135, and is enjoined.

■ Appellants, plaintiffs below, assigned error to the last mentioned ruling. We hold that this question was correctly decided.

Section 135 of the Constitution, quoted below, provides that the annual interest on the literary fund, the State's share of the capitation tax and an amount equal to the annual tax on property of not less than one nor more than five mills on the dollar (together constituting what is commonly referred to as the "constitutional minimum" or "absolute appropriation"), shall be applied by the General Assembly "to the schools of the primary and grammar grades, for the equal benefit of all the people of the State." If this plainly stated purpose needs further clarification, it may be found in the Debates of the Constitutional Convention of 1901-1902 on the report of the Committee on Education and Public Instruction, where at page 1193 the chairman of the committee, Mr. McIlwaine, stated:

"The next change is that the tax on property of not less than one nor more than five mills on one dollar shall be appropriated to the public free schools of the primary and grammar grades. That is to say, that the whole tax furnished by the State is to be paid for the education of the children in the primary and grammar grades. None of it is to go to the high schools. That is provided for in the latter part of this section."

Similar expressions appear at pages 1199-1201. It is clear that the limitation expressed in the section was deliberate and that the funds constituting the constitutional minimum under § 135 must be devoted to the schools of the primary and grammar grades, and none of it may be spent for the care and maintenance of the high school buildings, as the trial court properly held.

■ The guardian *ad litem* for the infant defendants assigned cross-error to the refusal of the trial court to dismiss the bill and to strike the evidence as to the infants. The motion was made on the ground that whatever controversy existed between the plaintiffs and the infant defendants was already in process of litigation in *Allen, et al.* v. *County School Board of Prince Edward County, et al.*, pending on appeal in the Fourth Circuit, *sub nom., Griffin, etc., et al.* v.

*County School Board of Prince Edward County, et al.* A decision was rendered in that case on August 12, 1963, reported in 322 F. 2d 332, in which the judgments of the District Court were vacated and the case remanded with instructions to that court to abstain from conducting further proceedings until this court decided the present case. The motion of the guardian *ad litem* was properly overruled.

■ The principal question here is, of course, whether the trial court was correct in its holding that Article IX of the Virginia Constitution and the statutes enacted pursuant thereto establish a local option system of public free schools in Virginia which leaves to the local authorities the decision of whether public free schools shall be operated in the locality. Stated another way, the question is whether the Commonwealth of Virginia is required and has the mandatory duty under its Constitution and laws to establish, maintain and operate public free schools in Prince Edward county.

Its duty is to obey the voice of its people as spoken in its Constitution, unless the commands there given are forbidden by the Federal Constitution. The present Constitution of Virginia was ordained in 1902 and the will of the people with respect to the subject of "Education and Public Instruction" is set out in Article IX, composed of fourteen sections, numbered from 129 through 142. Only §§ 129 through 136 and § 141 are material to the present question and they are set forth in the margin, either verbatim or in relevant part.*

---

* § 129. Free schools to be maintained.—The General Assembly shall establish and maintain an efficient system of public free schools throughout the State.

§ 130. State Board of Education; composition; vacancies, how filled.—The general supervision of the school system shall be vested in a State Board of Education, to be appointed by the Governor, subject to confirmation by the General Assembly, and to consist of seven members. * *

§ 131. Superintendent of Public Instruction; appointment; term of office; how elected; duties.—A Superintendent of Public Instruction, who shall be an experienced educator, shall be appointed by the Governor, subject to confirmation by the General Assembly, for a term coincident with that of each Governor making the appointment; * * provided * * that the General Assembly shall have power, by statute enacted after January first, nineteen hundred and thirty-two, to provide for the election or appointment of a Superintendent of Public Instruction in such manner and for such term as may be prescribed by statute. * * The powers and duties of the Superintendent of Public Instruction shall be prescribed by law.

§ 132. Powers and duties of State Board of Education.—The duties and powers of the State Board of Education shall be as follows:

First. It shall divide the State into appropriate school divisions, comprising not less than one county or city each, but no county or city shall be divided in the formation of such divisions. It shall certify to the local school board or boards of each division in the State a list of persons having reasonable academic and business qualifications for division superintendent of schools, one of whom shall be selected

In construing these sections we are required to apply these established rules:

as the superintendent of schools for such division by the said school board or boards, as provided by section one hundred and thirty-three of this Constitution.

Second. It shall have the management and investment of the school fund under regulations prescribed by law.

Third. It shall have such authority to make rules and regulations for the management and conduct of the school as the General Assembly may prescribe; but until otherwise provided by law, the State Board of Education may continue existing rules and regulations in force and amend or change the same.

Fourth. It shall select textbooks and educational appliances for use in the schools of the State, exercising such discretion as it may see fit in the selection of books suitable for the schools in the cities and counties, respectively; provided, however, the General Assembly may prescribe the time in which the State Board of Education may change the textbooks.

§ 133. School districts; school trustees.—The supervision of schools in each county and city shall be vested in a school board, to be composed of trustees to be selected in the manner, for the term and to the number provided by law. Each magisterial district shall constitute a separate school district, unless otherwise provided by law, and the magisterial district shall be the basis of representation on the school board of such county or city, unless some other basis is provided by the General Assembly, provided, however, that in cities of one hundred and fifty thousand or over, the school boards of respective cities shall have power, subject to the approval of the local legislative bodies of said cities, to prescribe the number and boundaries of the school districts.

The General Assembly may provide for the consolidation, into one school division, of one or more counties or cities with one or more counties or cities. The supervision of schools in any such school division may be vested in a single school board, to be composed of trustees to be selected in the manner, for the term and to the number provided by law. Upon the formation of any such school board for any such school division, the school boards of the counties or cities in the school division shall cease to exist.

There shall be appointed by the school board or boards of each school division, one division superintendent of schools, who shall be selected from a list of eligibles certified by the State Board of Education and shall hold office for four years. In the event that the local board or boards fail to elect a division superintendent within the time prescribed by law, the State Board of Education shall appoint such division superintendent.

§ 134. Literary fund.—The General Assembly shall set apart as a permanent and perpetual literary fund, the present literary fund of the State; the proceeds of all public lands donated by Congress for public free school purposes; of all escheated property; of all waste and unappropriated lands; of all property accruing to the State by forfeiture, and all fines collected for offenses committed against the State, and such other sums as the General Assembly may appropriate; provided that when and so long as the principal of the literary fund amounts to as much as ten million dollars, the General Assembly may set aside all or any part of moneys thereafter received into the principal of said fund for public school purposes including teachers retirement fund to be held and administered in such manner as may be provided by general law.

§ 135. Appropriations for school purposes, school age.—The General Assembly shall apply the annual interest on the literary fund; that portion of the capitation tax provided for in the Constitution to be paid into the State treasury, and not

"The constitution must be viewed and construed as a whole, and every section, phrase and word given effect and harmonized if possible. * *." *Dean* v. *Paolicelli*, 194 Va. 219, 226, 72 S.E.2d 506, 511.

"Legislative construction of a constitutional provision is entitled to consideration, and if the construction be contemporaneous with adoption of the constitutional provision, it is entitled to great weight. * * Long acquiescence in such an announced construction so strengthens it that it should not be changed unless plainly wrong. * *." 194 Va. at 227, 72 S.E.2d at 511.

"The public school system has been created and developed by virtue of the several constitutional and statutory provisions. The system is embodied in no single provision. In order to arrive at an understanding of the school system as created and developed, we must read and consider all of the related provisions of the law to-

returnable to the counties and cities; and an amount equal to the total that would be received from an annual tax on the property of not less than one nor more than five mills on the dollar to the schools of the primary and grammar grades, for the equal benefit of all the people of the State, to be apportioned on a basis of school population; the number of children between the ages of seven and twenty years in each school district to be the basis of such apportionment. And the General Assembly shall make such other appropriations for school purposes as it may deem best, to be apportioned on a basis to be provided by law.

§ 136. Local school taxes.—Each county, city or town, if the same be a separate school district, and school district is authorized to raise additional sums by a tax on property, subject to local taxation, not to exceed in the aggregate in any one year a rate of levy to be fixed by law, to be apportioned and expended by the local school authorities of said counties, cities, towns and districts in establishing and maintaining such schools as in their judgment the public welfare may require; provided that such primary schools as may be established in any school year shall be maintained at least four months of that school year, before any part of the fund assessed and collected may be devoted to the establishment of schools of higher grade. The boards of supervisors of the several counties, and the councils of the several cities and towns, if the same be separate school districts, shall provide for the levy and collection of such local school taxes.

§ 141. State appropriations prohibited to schools or institutions of learning not owned or exclusively controlled by the State or some subdivision thereof; exceptions to rule.—No appropriation of public funds shall be made to any school or institution of learning not owned or exclusively controlled by the State or some political subdivision thereof; provided, first, that the General Assembly may, and the governing bodies of the several counties, cities and towns may, subject to such limitations as may be imposed by the General Assembly, appropriate funds for educational purposes which may be expended in furtherance of elementary, secondary, collegiate or graduate education of Virginia students in public and nonsectarian private schools and institutions of learning, in addition to those owned or exclusively controlled by the State or any such county, city or town; second * *; third, that counties, cities, towns and districts may make appropriations to nonsectarian schools of manual, industrial or technical training and also to any school or institution of learning owned or exclusively controlled by such county, city, town or school district.

gether and analyze them in a comprehensive manner. In no other way can they be properly construed and applied. * *." *Board of Supervisors* v. *Cox,* 155 Va. 687, 708, 156 S.E. 755, 762 (1931).

Section 129 of the Constitution which, as we said in *Griffin* v. *Board of Supervisors of Prince Edward County,* 203 Va. 321, 327, 124 S.E.2d 227, 232 (1962), is plainly directed to the General Assembly and not to the local governing bodies, says "The General Assembly shall establish and maintain an *efficient system* of public free schools throughout the State." (Emphasis added) It does not say that the General Assembly shall operate the schools, or any school. Had that been the purpose it would have been easy to say so. In that event the word "system" that was used would have had no place, and the simple sentence "The General Assembly shall establish and operate efficient public free schools throughout the State" would have put the matter beyond doubt.

Section 129 is not self-executing. It leaves to the judgment of the General Assembly the manner and means of its execution implemented with no further requirement other than that of § 135 with respect to the application of the constitutional minimum funds, and subject to the provision of § 186 of the Constitution that "No money shall be paid out of the State treasury except in pursuance of appropriations made by law."

"Says Cooley in his work on Constitutional Limitations, p. 121: 'A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be employed and protected, or the duty imposed may be enforced; and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law.'" *Newport News* v. *Woodward,* 104 Va. 58, 61-2, 51 S.E. 193, 194.

A constitutional provision is not self-executing " 'when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law. Thus, a constitution may very clearly require county and town government; but if it fails to indicate its range, and to provide proper machinery, it is not in this particular self-executing, and legislation is essential.' " *Davis* v. *Burke,* 179 U.S. 399, 403, 45 L.ed. 249, 251, 21 S.Ct. 210, 212.

We have commented on the meaning and requirement of § 129 on more than one occasion. In *Scott County School Bd.* v. *Scott*

*County Bd. of Supervisors,* 169 Va. 213, 215, 193 S.E. 52, 53 (1937), we said:

"The Constitution provides that it shall be the duty of the General Assembly to provide for and maintain the public school system (Constitution, section 129), and the General Assembly has complied with that requirement by the enactment of a School Code, Acts 1928, ch. 471, as amended, Michie's Code 1936, sections 611 to 718, inclusive; and again by Acts of Assembly of 1936, ch. 314, p. 497."

Several years before that we said in *Board of Supervisors* v. *Cox, supra,* 155 Va. at 707, 156 S.E. at 761:

"It appears that the General Assembly, in obedience to the mandatory provisions of the Constitution, has established a State wide, efficient, free school system. It enacted a comprehensive school code and created a State Board of Education to carry through the plans for the establishment and maintenance of the school system."

When we look at the other sections of Article IX companion to § 129, it seems clear that it was never the intendment of the Constitution to make it the duty of the General Assembly to operate the schools.

█ Section 130 provided for the appointment of a State Board of Education and gave it the general supervision of the "school system" to be established and maintained.

Section 131 provided for the appointment of a Superintendent of Public Instruction with powers and duties to be prescribed by law.

The "powers and duties" of the State Board of Education were defined in § 132. It was required to divide the State into school divisions of not less than one county or city each. It must certify to the local school boards a list of persons suitable for selection by the local school board as division superintendent of schools. It was given the management and administration of the school fund, the authority to make rules and regulations for the management and conduct of the schools as the General Assembly might prescribe and to select textbooks and educational appliances.

Section 133 vested the supervision of the schools in each county and city in a local school board, to be selected as provided by law, and that board shall select a division superintendent from a list certified by the State Board of Education. It was amended in 1950 to provide for the consolidation of schools.

Having thus given form to the system of schools which it directed the General Assembly to establish and maintain, the framers of the

Constitution turned to the matter of the operation of the system to be established. It could not, of course, be operated without money, and the following sections deal with that and other matters of operation:

Section 134 established the literary fund and it was amended in 1944 to empower the General Assembly to set aside parts thereof above ten million dollars for public school purposes.

Section 135 required the General Assembly to apply to the schools of the primary and grammar grades (generally accepted as meaning the grades below high school) the constitutional minimum funds above referred to. It then permitted the General Assembly to make such other appropriations for school purposes "as it may deem best."

Then § 136 authorized each school district to raise additional sums by a tax on property, to be apportioned and expended by the local· school authority "*in establishing and maintaining such schools as in their judgment the public welfare may require* (emphasis added);" provided that the primary schools so established must be maintained at least four months before any of the money can be used to establish schools of higher grade.

The limitations upon the power and authority of the General Assembly with respect to schools and their operation imposed by these sections of the Constitution have frequently been recognized and applied by this court.

In *School Board of Carroll County* v. *Shockley*, 160 Va. 405, 168 S.E. 419 (1933), the General Assembly undertook by statute to require the Board of Supervisors of Carroll county to make a special levy for erecting and equipping a high school building in the county. The statute was held to be unconstitutional because:

"The local authorities of each county and school district being thus vested with the exclusive power to impose local taxes for school purposes under this section [136], the necessary implication is that the General Assembly is prohibited by the Constitution from exercising that power.

"This construction of the section (136) is in accordance with the interpretation placed upon it by the legislature itself in the statutes relating to the subject."

Then follow a reference to the illustrative statutes and this statement:

"As seen, the act under consideration directs that the proceeds of

the levy thereby imposed shall be used solely for the purpose of paying for the erection and equipment of a high school building at Hillsville, thereby depriving the local authorities of Carroll county of the power conferred upon them by the Constitution of determining for themselves the requirements of the public welfare, and, by the exercise of their own judgment, deciding how that welfare may best be subserved." 160 Va. at 413-4, 168 S.E. at 422-3.

This power of determination by the local authorities with respect to " 'establishing and maintaining such schools as in their judgment the public welfare may require' " was coupled with the authority given by § 136 to raise additional school funds in realization, said the opinion, "that the funds provided by the State might not be sufficient to maintain an efficient system of schools throughout the Commonwealth." 160 Va. at 412, 168 S.E. at 422.

In *Board of Supervisors of Chesterfield County* v. *County School Board*, 182 Va. 266, 28 S.E.2d 698 (1944), some of the history of the public school system in Virginia as far back as the Code of 1849 was reviewed, the provisions of §§ 129, 133 and 136 of the 1902 Constitution and statutes enacted thereunder were considered and the conclusion reached:

" 'From the beginning the school boards have been made bodies corporate. They have been given the responsibility by law of establishing, maintaining and operating the school system, along with the State Board of Education, Superintendent of Public Instruction and the Division Superintendent of Schools.

\* \* \*

" ' \* \* the Constitution of Virginia and the statutes of the State clearly set up the school board as an independent local agency charged by law with establishing, maintaining and operating "an efficient system of public free schools". It would be illogical to make the School Board solely responsible for the efficient conduct of the school system, and then give another board control over the expenditures to be made by the School Board. The school boards, because of the duties placed upon them by law, know accurately its personnel, its mode and manner of operation and the importance of the various parts of the system. This information the board of supervisors do not have. \* \*.' " 182 Va. at 275-6, 28 S.E.2d at 702.

Again in the landmark case of *Harrison* v. *Day*, 200 Va. 439, 106 S.E.2d 636 (1959), the several statutes enacted by the General Assembly at its 1956 extra session to prevent the integration of the public

schools, were declared unconstitutional because they breached the limitations placed by Article IX of the Constitution on the powers of the General Assembly with respect to operating public free schools. There we rejected the contention of the Attorney General that the General Assembly had plenary power to deal with the public free school system in any manner it deemed fit "unfettered by any requirements of, or limitations in, the Constitution of Virginia." 200 Va. at 446, 106 S.E.2d at 643. Specifically we held that the Act which provided for the closing of schools because of integration, divested local authorities of all power and control over them and vested such authority in the Governor, violated § 133 of the Constitution which vests the supervision of local schools in the local school board; that the Act which provided for the establishment and operation of a State school system to be administered by the Governor and under the State Board of Education violated § 133; and that the provision of that act which directed local school levies to be paid into the State treasury to be expended by the State Board of Education violated § 136 of the Constitution which requires that local school taxes be expended by the local school authorities.

"* * The legislature in adopting means to establish and maintain an efficient school system must do so within the framework of the Constitution." *Almond* v. *Gilmer*, 188 Va. 1, 30, 49 S.E.2d 431, 446.

The only funds for the operation of public schools required to be furnished by the General Assembly are the three funds constituting the "constitutional minimum" referred to above. As indicated above, Prince Edward county's share of these funds is wholly insufficient for operating the public schools in that county. During the school year 1960-61 the amount received by the School Board from this source was $39,360, which it expended, together with $2,644.40 "forest reserve fund," (Code § 22-119), for administration, maintenance of buildings, insurance and debt service, leaving a balance of $252.08 at the close of that year; and for the year 1961-62 the amount received was $39,360 plus $2,181.27 "forest reserve," which was expended for like purposes, leaving a balance at the end of that year of $156.28.

Section 135 authorizes the General Assembly to make such other appropriations for school purposes "as it may deem best." It has deemed it best to make such other appropriations on a conditional or matching basis, requiring the appropriation of funds by the localities, to be raised and expended as provided by § 136 by local school

authorities "in establishing and maintaining such schools as in their judgment the public welfare may require." As said by the trial judge in his very thorough opinion:

"Beginning with the Appropriation Act of 1916 (Acts of Assembly, 1916, Ch. 520), wherein the sum of $200,000 appropriated to the State Board of Education to be apportioned to the counties for use by the local school authorities in the establishment of one and two room rural schools was conditioned upon the local levies for county school purposes for the year aggregating a sum equal to or greater than the average rate of the levies of county school funds of the Commonwealth, and continuously since that time each successive Appropriation Act has required that county schools be in operation and that certain funds be levied, appropriated, or expended by the local governing body before any of the 'State' money becomes available. This makes the local governing body and through it, the people of the locality, the key to the public educational system of this Commonwealth."

That this has consistently been the pattern of appropriation through the years may be seen by reference to Acts 1918, pp. 693-4, 727; Acts 1928, pp. 394, 458; Acts 1938, pp. 819-20, 890; Acts 1960, p. 995; Acts 1962, pp. 1334-6.

These essential local funds have to be provided by the local governing bodies. The Board of Supervisors, the governing body of Prince Edward county, has since the school year 1958-59 refused to make appropriation of these necessary funds. It cannot be compelled to do so by the General Assembly, by this court, or by any authority except its own people. We so decided last year in *Griffin* v. *Board of Supervisors of Prince Edward County, supra.* There we held:

"Article IX of the Constitution, embracing the subjects of 'Education and Public Instruction,' contemplates that moneys for the establishment and maintenance of public free schools will be appropriated partly by the General Assembly and partly by the local governing units. Section 136 provides for the raising by local taxation of 'additional sums,' that is, sums in addition to those which the General Assembly may appropriate pursuant to the preceding sections of the Constitution."

\* \* \*

"We find in neither Section 136 of the Constitution nor in the statutes implementing it, any support for the petitioners' contention that the Board of Supervisors is under the mandatory duty to levy

local taxes and appropriate moneys for the support of public free schools in the county." 203 Va. at 324-5, 124 S.E.2d at 230-1.

We said that the first sentence of § 136 "authorized" the local political unit to raise additional sums, and that the word "authorized" denotes a grant of power and discretion to act but not a command or requirement; and the closing sentence of § 136, "The boards of supervisors of the several counties, * * shall provide for the levy and collection of such local school taxes," does not impose a mandatory duty on the Board to levy and appropriate these moneys. We referred to the holding in *School Board of Carroll County* v. *Shockley, supra,* that under § 136 the local authorities had the exclusive power to determine when additional funds, if any, should be raised by local taxation to supplement the funds provided by the State, with the exclusive power to levy the tax for school purposes, and

" 'The local authorities of each county and school district being thus vested with the exclusive power to impose local taxes for school purposes under this section, the necessary implication is that the General Assembly is prohibited by the Constitution from exercising that power.' " 203 Va. at 326, 124 S.E.2d at 232.

"Since the early days of the Commonwealth, we have repeatedly pointed out that the exercise of the power of taxation is a legislative function. * * The same is true when the power is exercised by a local governing unit. * *." 203 Va. at 328, 124 S.E.2d at 233.

Because of the refusal of the County Board of Supervisors of Prince Edward county to appropriate funds, the public free schools in the county are closed. We find nothing in the provisions of the Constitution that makes it the duty of the General Assembly in that case to take over these schools and operate them. As we have said in previous cases, it has performed the mandatory duty laid on it by § 129 of establishing and maintaining a system of public free schools throughout the State, and implementing it by School Codes.

Following the adoption of the Constitution, the General Assembly met in extra session and adopted a School Code, Acts Ex. Sess., 1902-3-4, ch. 509, p. 798. In § 1466 thereof it committed the management, control and operation of the public free schools to the district boards of school trustees, directing that board to build and equip school houses, employ and pay teachers, make rules for the government of the schools and conduct of the pupils; to call meetings of the people to consult as to school interests, and to take care that the schools were conducted according to law and with the utmost efficiency.

The present School Code is Title 22 of the Code as amended. This School Code does not require the establishment, maintenance or operation of any school anywhere in the State. It sets up a system under which public schools may be established, maintained and operated with local support and under local control, in accord with the other provisions and conditions of the Constitution. So it is provided by § 22-126 of the Code that each locality is authorized to raise money by a tax on property, to be expended by the local school authorities "in establishing, maintaining and *operating* such schools as in their judgment the public welfare requires, \* \*." (Emphasis added)

Such has been the General Assembly's interpretation of its duty under the Constitution for more than half a century, without dissent from the people. It seems late to say that it has failed to discharge its constitutional duty over this long period and has put a burden on the localities which they are not required to bear.

The Board of Education, the Superintendent of Public Instruction and the local school boards are, as we held in *Kellam* v. *School Board,* 202 Va. 252, 117 S.E.2d 96, agencies of the State in the performance of their duties, but the State has committed to them by its Constitution and laws no duty, no power and no means to operate public free schools apart from the will of the people of the localities as expressed by the local governing bodies.

The General Assembly may determine for itself what is an "efficient system" of public free schools so long as it does not impair or disregard constitutional requirements. *Harrison* v. *Day, supra,* 200 Va. at 451, 106 S.E.2d at 653.

It is for the General Assembly first to determine whether the failure of a locality to cooperate and assume its responsibility renders the system inefficient. It doubtless has the power to shape its appropriations for public schools under § 135 of the Constitution to correct an inefficiency in its established system, but that is in the area of legislative discretion, not in itself a constitutional requirement. The question of the efficiency of the system and whether it meets the constitutional requirement of § 129 becomes a matter of law only if it clearly appears that the system has broken down and adherence to it amounts to a disregard of constitutional requirements.

If the Constitution makes it the duty of the General Assembly to take over and operate the schools in Prince Edward county, it would have the same duty with respect to all other counties and cities of

the State. The result would be a centralization of control and of operation foreign to the spirit as well as the letter of the Constitution, and the destruction of the system adopted in good faith obedience to the requirements of the Constitution and used now for more than sixty years.

We think it clear that the Constitution as written does not make that requirement.

The Debates of the Constitutional Convention on the report of the Committee on Education and Public Instruction, from which came the present constitutional provisions, indicate that the method adopted by the General Assembly is in keeping with the requirements of Article IX. In the course of the debate an amendment was offered which would have required the State constitutional funds to be used to maintain primary schools for at least four months in each year. The proposed amendment did not find support and was withdrawn. Debates Constitutional Convention 1901-1902, vol. 1, pp. 1213-1218, 1229-1231. In the entire debate on the report no member made the direct proposal that the operation of the schools be placed in other than local hands. The proceedings indicate a purpose to leave the State only with the duty of establishing a system which would enlist the support of the localities and leave to them the determination of the number and character of the schools they were willing to operate. A member of the committee expressed it to be his understanding that "the report of this committee has as its underlying principle and its basis local self-government and home rule." "The discretion as to whether any or all schools are established is first vested in the local trustees, * *." Debates, pp. 1227-8.

■ As noted above, the trial court decided that the payment of State scholarship grants to the parents of children residing in Prince Edward county is not conditioned upon the operation of public free schools in the county and that such scholarships are available under §§ 22-115.29 *ff.* of the Code, even though the public schools in the county are closed.

The constitutional authority for these scholarships or tuition grants is § 141 of that instrument as amended in 1956, which provides, in relevant part, that the General Assembly and the local governing bodies, subject to the limitations imposed by the General Assembly, may "appropriate funds for educational purposes which may be expended in furtherance of elementary, secondary, collegiate or graduate education of Virginia students in public and nonsectarian private

schools and institutions of learning, in addition to those owned or exclusively controlled by the State or any such county, city or town * *."

*Harrison* v. *Day, supra,* 200 Va. at 452, 106 S.E.2d at 647, states:

"We find no constitutional objection to the prescribed procedure for making tuition grants out of funds properly available for the purpose. Section 141 of the Constitution, as amended, authorizing State and local appropriations for this purpose places no restriction on the manner in which this is to be done, thus leaving it to the discretion of the General Assembly."

The present tuition grants law was enacted by the General Assembly by Acts 1960, ch. 448, p. 703, now codified as §§ 22-115.29 through 22-115.35. These sections provide for the granting of State and local scholarships without reference to race or creed. Section 22-115.30 provides:

"Every child in this Commonwealth between the ages of six and twenty who has not finished or graduated from high school, and who desires to attend a nonsectarian private school located in or outside, or a public school located outside, the locality in which such child resides, shall be eligible and entitled to receive a State scholarship in the amount of one hundred and twenty-five dollars per school year, if attending an elementary school and one hundred fifty dollars if attending a high school."

Section 22-115.31 authorizes localities to provide local scholarships, for the education of children residing therein, in nonsectarian private schools located in or outside, and in public schools located outside, the locality.

Section 22-115.32 makes every child between six and twenty years of age residing in the locality who has not finished high school eligible for such local scholarships.

Section 22-115.34 provides that if the locality fails to provide such scholarships, the State Board of Education may direct the Superintendent of Public Instruction to do so, and the amount thereof shall be deducted from other State funds appropriated to such locality, but not from any funds to which the locality is entitled as welfare funds or for the operation of public schools.

We perceive nothing in or out of the statutes to render these scholarships unavailable to any eligible child in Prince Edward county whether public free schools are operated in the county or not.

The trial court further held, as noted, that neither the Four-

teenth Amendment nor any Federal statute requires a State to operate public free schools and that the failure of the local authorities of Prince Edward county to do so does not violate the rights of any of its citizens under the Fourteenth Amendment, although public free schools are operated in other localities in the Commonwealth.

This holding is supported by the recent decision in *Griffin* v. *Board of Supervisors of Prince Edward County, supra,* 322 F.2d 332, in which in an able opinion by Judge Haynsworth, the court said:

"As to the plaintiffs' contention, it may be summarily dismissed insofar as it is viewed as a contention that the Fourteenth Amendment requires every state and every school district in every state to operate free public schools in which pupils of all races shall receive instruction. The negative application of the Fourteenth Amendment is too well settled for argument [citing cases]. It prohibits discrimination by a state, or one of its subdivisions, against a pupil because of his race, but there is nothing in the Fourteenth Amendment which requires a state, or any of its political subdivisions with freedom to decide for itself, to provide schooling for any of its citizens. Schools that are operated must be made available to all citizens without regard to race, but what public schools a state provides is not the subject of constitutional command." (p. 336)

" * * * when there is a total cessation of operation of an independent school system, there is no denial of equal protection of the laws, though the resort of the poor man to an adequate substitute may be more difficult and though the result may be the absence of integrated classrooms in the locality." (p. 337)

After citing Federal cases in support of that principle, the court continued:

"Other courts have clearly held that a municipality which had been ordered to desegregate facilities which it had operated, may abandon the facilities without violating the injunctive order or the rights of the Negro plaintiffs [citing cases]. The only limitation of the principle is that a municipality may not escape its obligations to see that the public facilities it owns and operates are open to everyone on a nondiscriminatory basis by an incomplete or limited withdrawal from the operation of them. If the municipality reserves rights to itself in disposing of facilities it formerly owned and operated, subsequent operation of those facilities may still be 'state action.'" (p. 337)

As we have pointed out, the Constitution and laws of Virginia

have given to its localities an option to operate or not to operate public schools. Like options have been granted in other areas of governmental activities. Sections 16.1-201-2 provide for establishing local juvenile detention facilities. No county is required to construct one, but if it elects to do so the State will contribute to the cost of construction and operation. Similar provisions exist with respect to the State-local hospitalization program under §§ 32-292 *ff.* of the Code. As said in *Griffin* v. *Board of Supervisors*, 322 F.2d at 342:

"Federal analogies readily come to mind. The United States makes available to participating states which enact prescribed legislation, grants for unemployment compensation administration. Under the National Defense Education Act, federal funds are made available to localities conducting in their schools approved programs of science, mathematics and foreign languages. It is suggested that there is no geographic discrimination in the provision for such optional grants, though a state or locality may exercise its option not to participate." (p. 342)

"The rule is well settled that the Constitution of the United States in securing the equal protection of the laws does not prohibit legislation which is limited as to the territory within which it is to operate. * * All that the Federal Constitution requires is that they shall be general in their application within the territory in which they operate." 12 Am. Jur., Constitutional Law, § 488, p. 167.

"* * Territorial uniformity is not a constitutional requisite. * *." *Salsburg* v. *State of Maryland*, 346 U.S. 545, 552, 98 L.ed. 281, 288, 74 S.Ct. 280, 284.

No public official or public agency has assisted in the establishment or operation of the private schools conducted by the Prince Edward School Foundation. In *Griffin* v. *Board of Supervisors, supra,* 322 F.2d at 338, it is said, and it is also true in the present case, that there is no suggestion that any agency or official of the Commonwealth or the county has any authority to supervise the operation of the schools of the Foundation except insofar as Virginia exercises a general police supervision over all private schools and has accredited the schools of the Foundation where they met the requirements applicable to all private schools.

Our conclusion is that the trial court on this and all other questions discussed herein has decided correctly, and its decree is therefore

*Affirmed.*

Spratley, Whittle, Snead, I'Anson and Carrico, JJ., concurring.

We agree completely with the reasoning and conclusions of the majority opinion. We deem it appropriate to add these comments:

Our task here is to construe a Constitution, not to provide a remedy for a "shameful" situation, as the dissenting opinion characterizes the closing of public free schools in Prince Edward county, however regrettable that situation may be. That condition may be corrected, but an erroneous construction of the Constitution in an effort to furnish a remedy will be more difficult to correct.

The dissenting opinion agrees that the Constitution contemplates that the funds necessary for the operation of schools will be supplied partly by appropriations by the General Assembly and partly by appropriations by the local governing bodies; but, it asserts, if a single local governing body defaults in its obligation to supply the necessary funds for the operation of its schools, it then becomes the duty of the General Assembly to provide, for the use of the local school board in that community, the necessary funds with which the latter may operate the schools there.

If that be held to be the constitutional duty of the General Assembly, it takes little imagination to visualize the result. Very soon many, if not all, of the counties and cities of the State would cease making local appropriations and the schools would have to be financed entirely by State funds. Thus would come to an end the joint effort admittedly contemplated by the Constitution and in effect now for more than sixty years.

Where in the Constitution may be found the requirement that the General Assembly must appropriate the money which the delinquent locality fails to supply? The answer is that there is no such requirement. The Constitution is specific about what appropriation the General Assembly must make. Section 135 is devoted to that subject. In plain words it says what the General Assembly *shall* appropriate. It says that the General Assembly *shall* apply the "constitutional minimum" funds to the schools of the primary and grammar grades, and shall make such other appropriations for school purposes "as it may deem best". Clearly, the latter words are not the language of command. They are words of permission, to be exercised as the General Assembly may determine in its legislative function.

These words are similar in import to those used in Section 136, by which the localities are "authorized" to raise additional funds to

be spent by the local school authorities in "establishing and maintaining such schools as in their judgment the public welfare may require."

Of these words, Chief Justice Eggleston, speaking for the court, said in *Griffin* v. *Board of Supervisors of Prince Edward County, supra,* 203 Va. 321, 327, 124 S. E. 2d 227, 232, that they imposed no mandatory duty on the Board of Supervisors to appropriate school funds, but constituted a grant of power and discretion.

Can it reasonably be said that the like language of Section 135, authorizing the General Assembly to make such other appropriation "as it may deem best," is not a grant of power and discretion, but a mandatory requirement that the General Assembly appropriate all funds necessary for the operation of schools if the localities fail to appropriate their part? It has never heretofore been so construed.

We repeat the statement in the *Griffin* case "that the exercise of the power of taxation is a legislative function." The appropriation of money raised by taxation is also a legislative function, specifically and distinctly made so by Section 135 of the Constitution with respect to appropriations for school purposes beyond the minimum sums named therein.

This court should not now undertake to direct the exercise of that legislative function so specifically granted to the General Assembly by the Constitution. Rather we should observe the command of that document in Section 5 that the legislative and judicial functions should not encroach upon each other but be kept apart.

It is not our belief that the interpretation of our State Constitution as made by us involves the denial of any right guaranteed to any citizen of Prince Edward county by the Constitution of the United States, or that a different interpretation is required in order to prevent the Federal courts from stepping in to enforce such supposed right.

EGGLESTON, C.J., dissenting.

The majority opinion holds *inter alia:* (1) There is no constitutional obligation on the General Assembly to relieve the closing of the public free schools in Prince Edward county; (2) the refusal of the local Board of Supervisors and the General Assembly to supply the necessary funds with which to maintain and operate the schools in Prince Edward county does not violate the rights of the citizens

of that county guaranteed to them under the Fourteenth Amendment.

I disagree with both holdings.

As to the first point, I am firm in the view that the General Assembly is under the constitutional duty to relieve the closing of public free schools in Prince Edward county, a situation which has brought to this State the shameful distinction of having within its borders the only school district in this Nation where public free schools are not provided for its children.

The majority opinion argues at great length that under our Constitution it is not the duty of the General Assembly but that of the local school boards to *operate* public free schools. No one questions that. Nor until the situation in Prince Edward county arose did anyone question that the operation of public free schools is primarily a function of the State which establishes the machinery for such operation and that the local bodies are merely the agencies of the State in such operation. As we said in *Kellam* v. *School Board of City of Norfolk*, 202 Va. 252, 254, 117 S. E. 2d 96, 98, pursuant to the mandate of the Constitution, "the legislature has established school boards to act as agencies of the State in carrying out the obligations imposed."

However that may be, we are not here primarily concerned with whose duty it is to *operate* the schools. The question is whose duty it is to *maintain* and support them. It is everywhere held that the maintenance of public schools is a state governmental duty and not a local function. 47 Am. Jur., Schools, § 6, pp. 299, 300; 78 C. J. S., Schools and School Districts, § 17, p. 632.

As I see it, the specific issue in this case is whether, under the provisions of the Constitution of Virginia, it is the duty of the General Assembly to supply the necessary funds with which to operate public free schools in Prince Edward county where the local Board of Supervisors has refused to do so.

An affirmative answer to this question is found in the plain wording of § 129 of the Constitution which reads: "The General Assembly shall establish and maintain an efficient system of public free schools throughout the State." This section stands at the head of Article IX of the Constitution dealing with "Education and Public Instruction."

We have several times said that the section is mandatory and means just what it says. *Harrison* v. *Day*, 200 Va. 439, 450, 106 S. E. 2d 636, 645, and cases there cited.

The language of § 129 is plain and specific. It imposes on the General Assembly the duty to "establish" and the duty to "maintain" an efficient system of public free schools "throughout the State." To "maintain," as defined in Webster's New International Dictionary, 3d Ed., means among other things, to "support" and "bear the expense of." We accepted and applied that definition in *Savage* v. *Commonwealth*, 186 Va. 1012, 1020, 45 S. E. 2d 313, 317.

But what is conclusive of the matter is our holding in *Harrison* v. *Day, supra,* that this section "requires the State to '*maintain* an efficient system of public free schools *throughout the State.*' [Emphasis by the court.] That means that the State must *support* such public free schools in the State as are necessary to an efficient system, * * *." (Emphasis added.) 200 Va., at page 450, 106 S. E. 2d, at page 646.

Webster's New International Dictionary, 3d Ed., defines "throughout" as meaning "in or to every part of." Accordingly, "throughout the State" means in every part of the State, which embraces every locality or school district in the State.

The majority opinion holds that under § 129 of the Constitution it is the obligation of the General Assembly to establish a "system of public free schools," that it has done so by setting up a system whereby the necessary funds are furnished partly by the State and partly by the local governing bodies, and that having done this, the General Assembly has discharged its full constitutional duty and is not concerned if a particular locality refuses to do its duty. While this may satisfy the requirement for the General Assembly to "establish" a system, it ignores its duty to "maintain" such system.

It is true that the Constitution contemplates that the funds for the operation of schools will be supplied partly by appropriations by the General Assembly (§§ 134, 135) and partly by appropriations by the local governing bodies (§ 136). In *Griffin* v. *Board of Supervisors of Prince Edward Co.,* 203 Va. 321, 327, 124 S. E. 2d 227, 232, we held that it is within the discretion of a local board of supervisors whether it will supply its share of the necessary funds to operate a local school. But it does not follow that where such local governing body refuses to discharge its duty the General Assembly is under no constitutional duty to supply this deficiency.

Section 135 of the Constitution, after providing that the General Assembly shall apply "the annual interest on the literary fund" and a portion of the capitation tax to school purposes, directs that it "shall make such other appropriations for school purposes as it may

deem best." But that section must be read in connection with § 129 which requires the General Assembly to "maintain" an efficient system of public free schools throughout the State. Thus, while under § 135 the General Assembly may appropriate such funds "as it may deem best," such appropriation may not fall below the requirements of § 129.

If, as the majority opinion holds, Prince Edward county may refuse to appropriate its share of the necessary funds for the operation of its public free schools without imposing any additional financial obligation on the General Assembly, then each county or city may do likewise. In short, by the refusal of the localities to bear their respective shares of the cost of operating their public free schools the whole system might collapse, and yet there would be no duty on the General Assembly to maintain these schools. How can this reasoning be squared with the requirement on the General Assembly to maintain an efficient system of public free schools "throughout the State?" How can there be an efficient system of public free schools without any such schools? How can there be an efficient system of public free schools "throughout the State" so long as there are no such schools in Prince Edward county?

Obviously, the General Assembly does not satisfy the requirement of § 129 to "maintain" an efficient system of public free schools "throughout the State" where it fails to supply the necessary funds in case the local governing bodies refuse to do so.

In my opinion, where a single local governing body defaults on its obligation to supply the necessary funds for the operation of its schools, it is not the duty of the General Assembly, under § 129 of the Constitution, to take over and operate such schools. But, in that event, and under that section, it becomes the duty of the General Assembly to appropriate, for the use of the local school board in that community, the necessary funds with which the latter may operate the schools there. This is quite in accord with the constitutional plan that the operation of such schools is the function of the local school boards.

The majority opinion holds that to do this might upset the present method of operating the public free schools, because, it says, every locality in the State might refuse, and indeed would be encouraged to refuse, to appropriate its share of the necessary funds, and that this would require the General Assembly to assume the entire obligation of furnishing the funds for the operation of such schools.

The obvious answer is that § 129 contemplates that the General Assembly shall assume this obligation rather than allow the public free schools to be closed in all localities, or even in a single locality. This would be in accord with what has been said is the well-recognized principle that the financial maintenance of public free schools is a state function.

As to the second point, in my opinion, the refusal of the Board of Supervisors and the General Assembly to supply the necessary funds for the maintenance of public free schools in Prince Edward county, while such public free schools are maintained elsewhere throughout the State, clearly denies to the citizens of that county, both white and colored, the equal protection and privileges of the law guaranteed to them under the provisions of the Fourteenth Amendment.

The local boards of supervisors and the local school boards, as has been said, are mere agencies of the State in providing the local funds necessary for the maintenance and operation of the schools. Thus, in its final analysis, the default is a default of the State.

The majority opinion argues that we have many instances in which a particular locality or localities are granted local option privileges which are denied to other localities and that it is well settled that these local option privileges do not violate the equal protection provisions of the Fourteenth Amendment. But to my mind we may not equate the constitutional right to an education in the public free schools in the State with such local option privileges. One is a necessity guaranteed to the citizens in the performance of a governmental function; the others are mere privileges which the State may grant or refuse at its pleasure.

The refusal of the highest court of this State to recognize here the rights of the citizens of Prince Edward county, guaranteed to them under the Constitution of the United States, is a clear invitation to the federal courts to step in and enforce such rights. I am sure that that invitation will be promptly accepted. We shall see!